IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,      )     Case No. 5:22-CR-00221-OLG-1
                               )
          Plaintiff,           )
                               )
     vs.                       )
                               )
KEISHA LYN SWARNER,            )
                               )
          Defendant.           )     Friday, September 30, 2022
_____)        3:08 P.M.


TRANSCRIPT OF MOTION TO REOPEN DETENTION HEARING AND
GRANT PRETRIAL RELEASE
**BEFORE THE HONORABLE ELIZABETH S. CHESTNEY**
**UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                            BY:  WILLIAM CALVE, ESQUIRE
                            601 NW Loop 410, Suite 600
                            San Antonio, Texas 78216

For the Defendant:          Office of th Federal Public Defender
                            BY:  DAVID KIMMELMAN, ESQUIRE
                            727 E César East Chávez Blvd.
                            San Antonio, Texas 78205

Deputy Clerk:               Valeria Sandoval
                            U.S. District Court
                            655 E César East Chávez Blvd.
                            San Antonio, TX 78206

Transcription Service By:   Dipti Patel, CET-997
                            Liberty Transcripts
                            7306 Danwood Drive
                            Austin, Texas 78759
                            (847) 848-4907
                            www.libertytranscripts.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

|                                                                                      | <u>PAGE</u> |
|--------------------------------------------------------------------------------------|------|
| Case called                                                                          | 3    |
| Proffer of Testimony of Agent Gerald Martin                                          | 7    |
| Arguments on Government's Motion To Reopen Detention Hearing and Grant Pretrial Release |    |
|    By:  Mr. Calve                                                     | 15   |
|    By:  Mr. Kimmelman                                                 | 19   |
| Court's Ruling                                                                        | 25   |
| End of Proceedings                                                                    | 26   |
| Certificate of Transcriber                                                            | 26   |

|  | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|--|--------|-------|----------|---------|

<u>WITNESSES</u>

<u>FOR THE GOVERNMENT</u>:

(None)

<u>FOR THE DEFENDANT</u>:

(None)

|  | <u>ID</u> | <u>EVD</u> |
|--|------|------|
| <u>EXHIBITS:</u> | | |

<u>FOR THE GOVERNMENT</u>:

(None)

<u>FOR THE DEFENDANT</u>:

(None)

1  <u>San Antonio, Texas - Friday, September 30, 2022</u>   (3:08 p.m.)

2                    **P R O C E E D I N G S**

3                         ---O0O---

4         THE COURT:  You may be seated.

5         THE CLERK:  United States of America versus Keisha Lyn

6  Swarner, SA:22-CR-00221.

7         THE COURT:  Good afternoon.  I'll have appearances,

8  please.

9         MR. CALVE:  Billy Calve for the United States.  Good

10 afternoon, Your Honor.

11        THE COURT:  Good afternoon.

12        MR. KIMMELMAN:  Good afternoon, Your Honor.  David

13 Kimmelman for Ms. Swarner.

14        THE COURT:  Good afternoon.  Good afternoon, Ms.

15 Swarner.  We are here today on the motion to reopen the detention

16 hearing and grant pretrial release.

17        Government's not opposed to reopening the hearings

18 since she didn't have one, correct?

19        MR. CALVE:  That's right, Your Honor.

20        THE COURT:  Okay.  All right.

21        So Mr. Kimmelman, where should we begin?

22        MR. KIMMELMAN:  Your Honor, I think that the Government

23 has --

24        THE COURT:  The burden on the matter of detention?

25        MR. KIMMELMAN:  Well, they did elect the rebuttable

1    presumption.  And so we're prepared to rebut that presumption and

2    shift the burden back to the Government.

3          THE COURT:  Okay.

4          MR. KIMMELMAN:  And by way of proffer, Your Honor, I

5    have submitted to the Court the report from Dr. Michael Thompson.

6          THE COURT:  And I've read it.

7          MR. KIMMELMAN:  And in addition, there is the Pretrial

8    Services Report that sets forth Ms. Swarner's personal

9    circumstances, her family relationships, and things of that sort.

10   The only additional information to proffer -- and by the way, Mr.

11   Swarner is present in the courtroom and he did verify all of her

12   information.

13          The additional information I would proffer to the Court

14   is that while Ms. Swarner has been detained, she has had issues

15   with the medication regimen there at the detention facility.  She

16   has had ongoing issues with her eardrum that was injured as a

17   child.

18          She has been developing frequent infections in her ear

19   that have not been adequately addressed by the medical staff

20   there at the detention facility.  And that would be our proffer.

21   And I think that would be sufficient to rebut the presumption.

22   Unless the Court has any questions about any of the information

23   that the Court has --

24          THE COURT:  I believe that your response or your motion

25   and the doctor's report indicate that the children -- the minor

1  children that were in the home have been removed.  Is that

2  correct?

3          MR. KIMMELMAN:  That's correct, Your Honor.  And there

4  is -- thank you for that question.  There is an ongoing case with

5  the Child Protective Services for the State of Texas.  Ms.

6  Swarner is vigorously defending that case.  She has counsel in

7  that case.  In fact, she has a hearing scheduled for next week in

8  that case and she is fighting that case as we speak.

9          THE COURT:  Okay.  All right.

10         Mr. Calve, are you going to call a witness?

11         MR. CALVE:  Yes, Your Honor.  I was going to offer a

12  proffer from Special Agent Gerald Martin here with NCIS.  I did

13  have a couple of corrections to the Pretrial Services Report.

14         THE COURT:  It was quite a while ago.

15         MR. CALVE:  Yes, Your Honor.  It was.

16         THE COURT:  And I believe I had -- I think we had a

17  preliminary hearing in this case, and there was -- or was it a

18  preliminary hearing on the original charge?

19         MR. CALVE:  I don't believe we did, Your Honor.

20         THE COURT:  Okay.  Then it was just the affidavit that

21  I'm recalling and the facts from.  All right.

22         MR. CALVE:  Your Honor.  Just that on page 4 of the

23  Pretrial Services Report, where it lists the criminal history,

24  for example, the animal cruelty, bestiality.  It says that all of

25  this happened when she was ten-years-old.  But she is 39-years-

1  old.  I don't believe she was ten-years-old in 2002.  So I think

2  that's just a mistake on the age of the Defendant at that

3  particular time.

4       THE COURT:  Okay.  But it was when she was a juvenile,

5  just not when she was ten?

6       MR. CALVE:  I don't think so, Your Honor.  If my math

7  is correct, and I don't have a date of birth exactly in front of

8  me for the Defendant, but if she's 39-years-old --

9       THE COURT:  Okay.

10      MR. CALVE:  -- today.

11      THE COURT:  Then she was in her --

12      MR. CALVE:  Okay.  So I do have a date of birth.  I

13  apologize, Your Honor.  That would be 1982.  So that would put us

14  at 20-years-old --

15      THE COURT:  Okay.

16      MR. CALVE:  -- for those events.

17      THE COURT:  All right.  That makes a lot more sense

18  because it had felony convictions.  And I wasn't sure I thought

19  maybe the State of Washington had very strange rules, but --

20      MR. CALVE:  I was wondering the same.

21      THE COURT:  Okay.  All right.

22      MR. CALVE:  And the only other correction would be that

23  on page 1 of the Pretrial Services Report, it has the original

24  offense that was in the criminal complaint, abusive sexual

25  contact with a minor.  Of course, since then, she has been

1  indicted on other offenses.

2       THE COURT:  Including, is it distribution?

3       MR. CALVE:  Distribution of child pornography, aiding

4  and abetting.  And then promotion of child pornography,

5  assimilating state law and then online solicitation of a minor

6  also assimilating state law.

7       THE COURT:  Okay.  And you said you were going to

8  provide a proffer?

9       MR. CALVE:  Yes, Your Honor.

10      THE COURT:  Okay.  Go ahead.

11      MR. CALVE:  This proffer is from Special Agent Gerald

12 Martin with the Naval Criminal Investigative Service.  He's been

13 with NCIS since 2006, and participates in investigations into the

14 exploitation of children.  Agent Martin is the case agent over

15 the investigation into the Defendant, Keisha Swarner.  He's here

16 for a bond hearing today.

17      This proffer is going to highlight some of the

18 pertinent facts from the investigation, some of which may have

19 already been included in the criminal complaint, for which Agent

20 Martin was the affiant, as well as provide some additional

21 information to the Court on the matter of bond.

22      On April the 1st, 2022, a concerned parent, who I'm

23 going to refer to as the Complainant, approached Joint Base San

24 Antonio Lackland Security Forces about a Lackland resident.  The

25 Defendant had been sending explicit text messages to her 13-year-

old son who I'm going to call Child Victim number 1. She had discovered a phone in her son's possession where Defendant was saved as a contact called "mom".

Among other texts, Complainant found CV1 had sent Defendant a photo of himself wearing only a towel stating he had no hot water, and the Defendant replying that he should shower at her house. Complainant also found discussions between CV1 and the Defendant about lewd pictures of CV2, Child Victim number 2 is how I'm going to refer to that individual.

Earlier in the year in January 2022, the Complainant had reported to Lackland Security Forces that Defendant hosted a coed children's sleep over at her home where children were kissing and playing spin the bottle while the Defendant was present. Complainant had reported at that time that Defendant impersonated Complainant while talking with another child's mother in order to get permission for that child to sleep over.

As a result of the sleep over, Complainant did not allow her 13-year-old son, CV1, to have contact with Defendant or her husband, Carl Swarner. But nevertheless, on April the 1st, Complainant had found the cell phone in CV1's possession and found it containing explicit conversations, records of money sent from Defendant to CV1 via Cash App, and texts from CV1 to Defendant asking if he could use the money.

Complainant found other expensive gifts that had been given to CV1 by the Defendant, including a Visa card, clothes, an

Xbox game and an Xbox controller.  On April the 5th, 2022 the Defendants husband, Carl, called base authorities and said he wanted his cell phone back.  He was told the phone had been taken up by investigators.

CV1 spoke with base authorities stating that Defendant had given him three or four iPads and two iPhones to communicate, and told him not to tell his parents about the devices. Defendant told CV1 that her 12-year-old daughter, CV2, had never seen a penis and paid CV1 money to take pictures of his penis and send them to CV2.  CV1 took three to four pictures of his penis and sent them to CV2, and CV2 sent him approximately four pictures of her breasts.

The first time Defendant made this request of CV1, Defendant told CV1 she would pay him in cash.  The second time, Defendant said she would buy him anything at GameStop.  The third time, Defendant said she would give him $20.  CV1 also said Defendant paid him money to put on a girl's bathing suit.

CV1 stated he would frequently go to Defendant's residence at Lackland.  Defendant would text him and tell him to meet at a certain location and Defendant and CV2 would pick CV1 up near his home or school and bring them -- bring him to their residence.  Defendant told CV1 it was illegal for her to bring him onto the base so he was not to tell anyone about it.

While at Defendant's residence, Defendant told CV1 to cuddle with CV2 on various occasions.  On one such occasion,

1    Defendant told CV1 to have sex with CV2, which he refused.

2    Defendant also told CV1 to touch CV2's vagina.  NCIS also spoke

3    with the Complainant concerning this investigation.

4            CV1 had been telling Complainant he was going on long

5    runs with their dog when he was really being picked up in a

6    vehicle by the Defendant and taken to various places like Sonic,

7    McDonald's and eventually back to the Defendant's residence at

8    Lackland.

9            A review of CV1's cell phone revealed several occasions

10   in March 2022 where Defendant sent money to CV1 on Cash App.  A

11   review of CV1s messages confirm that CV1 sent photos of his penis

12   to CV2 on several dates in March.  A review also showed CV2

13   sending photos of her breasts to CV1 on March the 22nd.  On that

14   same day, this conversation took place between CV1 and the

15   Defendant:

16           "CV1:  I showed her my dick, so when can I see them

17   titties?

18           "DEFENDANT:  Talk to her.

19           "CV1:  Okay. Can you also talk to her?

20           "DEFENDANT:  Yeah, when she comes out of the shower.

21           "CV1:  "Okay. I'm taking a shower.  I want to see her

22   tito's.  I love her ass.  She be teasing me though.

23           "DEFENDANT: Defendant:  Enjoy your shower.  Yeah, I

24   agree.

25           "CV1:  About me seeing her titties?"

1          "DEFENDANT:  I agree with you.  I will tell her."

2          Shortly after that, CV2 sent photos of her breasts to

3  CV1.  And notably the following conversation also took place on

4  March the 27th.  Defendant said, "But you have to try and touch

5  her too."  Following a conversation in which she had engaged with

6  CV1 about what appeared to be sexual contact between CV1 and CV2.

7  And it concluded with Defendant telling CV1, "Now masturbate."

8          In this conversation on March 27th, Defendant said:

9          "DEFENDANT:  But you have to try and touch her, too.

10          "CV1:  Okay.

11          "DEFENDANT:  She said you started to and then you

12  stopped.

13          "CV1:  Touch her?  Like where?

14          "DEFENDANT:  Vagina.

15          "CV1:  I'm scared.  What if she gets uncomfortable?

16          "DEFENDANT:  She will tell you.

17          "CV1:  Okay.

18          "DEFENDANT:  I told her she would never know if she

19  likes it unless she tries.  She said okay."

20          A review also showed the following exchange between

21  Defendant and CV1 the next day.

22          "DEFENDANT:  Did your penis go inside CV2?

23          "CV1:  Maybe.  We tried.

24          "DEFENDANT:  Did you really?

25          "CV1:  We didn't know how to do it.

1    "DEFENDANT:  LOL.  You'll figure it out.

2    "CV1:  Okay.

3    "DEFENDANT:  Try again.

4    "CV1:  When?  Today?

5    "DEFENDANT:  Whenever you want."

6    Further review of the phone showed regular FaceTime

7    videos and calls between CV1 and the Defendant as well as that

8    CV1 was friends with Defendant on Snapchat.

9    NCIS arrested the Defendant pursuant to a criminal

10   complaint on April the 14th of 2022, Mirandized her, and

11   conducted a recorded post-arrest interview.  Defendant initially

12   denied involvement in CV1 and CV2's relationship, claiming she

13   never brought CV1 on base and CV2 was the one who was using

14   Defendant's phone to text with CV1.

15   Defendant claims CV1 was lying about bringing him on

16   base.  And she brought up that she recorded audio of him

17   confessing that he was making this up.  But the Defendant's story

18   slowly changed.

19   Defendant admitted to sending many of the messages,

20   including the exchange where Defendant agreed to talk to CV2

21   about sending photos of her breasts to CV1, and in the exchange

22   where Defendant told CV1 to touch CV2 on her vagina and to try

23   again to have sex.  She acknowledged CV1 had been coming to her

24   home.

25   Agents took custody of the Defendant's phone, and

during their review found TikTok messages between Defendant and
CV1 on April the 4th, 2022. This was after CV1's cell phone had
been turned in to the authorities.

In these TikTok messages, Defendant told CV1: "Your
mom is going for criminal charges." And then attempted to coach
CV1 about his story saying, "But CV1, you were never in my car.
CV2 always met you at the park." Even after CV1 replied, no,
Defendant reiterated, "CV1, you were never in my car. Yes, you
saw CV2, but she met you at the park. There's nothing wrong with
doing that."

Defendant also asked CV1 if he could get on Snapchat.
Later in the conversation, CV1 told Defendant he was going the
next day to talk to the base people. Defendant asked, "What are
you going to say?" CV1 responded, "You should have told the
truth." The next day, Carl Swarner attempted to get CV1's phone
from the base authorities.

Further review of Defendant's phone show that the
following day on April the 6th, Defendant instructed CV2 to go
into CV1's iPad and delete the TikTok messages from her. Agents
have found recordings on Defendant's phone from April 22 -- April
2022, in which she seemingly is continuing to try to coach CV1
after he spoke to the investigators and attempting to get him to
say that he lied to them.

Defendant tries to lead CV1 into saying that he never
went to her house and only had gone to the park. Notably,

Defendant has since admitted to investigators that CV1 was coming to her house.

Special Agent Martin has found older messages from March 2022 in which Defendant repeatedly pressured CV1 about his physical contact with CV2, becoming aggressive and cursing at CV1 when CV1 was not behaving according to her expectations, saying, "Why are you not cuddling with her ass?" And "You know you can make the move, too. You did F-U-C-K up today. What is wrong?"

On another occasion, Defendant texted CV1 with a thread about taking away his GameStop saying, "You're a lying bitch. We just saw you at your house asshole. Lying just lost you GameStop."

On March 16, 2022, Defendant instructed CV1, "Put your phone away so no one can find it. And if they find it, we're in so much trouble." Special Agent Martin also found photos of CV1 in the Defendant's phone wearing what appears to be a girl's bathing suit.

In a jail call between Defendant and Carl Swarner from May 2022, Defendant is discussing her case and says it all depends on what CV2 said, if CV2 lied. At the time all this happened, Defendant was a fifth-grade school teacher with Edgewood ISD. And that concludes the proffer, Your Honor.

THE COURT: Mr. Kimmelman, are you going to cross-examine the agent?

MR. KIMMELMAN: No, Your Honor.

1          THE COURT:  Okay.  All right.

2          Mr. Calve, any other evidence?

3          MR. CALVE:  No, Your Honor.  Just argument.

4          THE COURT:  Okay.  Mr. Kimmelman, any other evidence?

5          MR. KIMMELMAN:  No, Your Honor.

6          THE COURT:  Okay.  I guess I'll let you go first.

7          MR. CALVE:  Thank you, Your Honor.  I'll start by

8    noting that this is a presumption case.

9          THE COURT:  And you did receive a copy of the

10   psychologist's report, I assume?

11         MR. CALVE:  Yes, Your Honor.  I did.

12         THE COURT:  Okay.

13         MR. CALVE:  I understand that this is a presumption

14   case.  We do begin with the presumption that there are not

15   conditions this Court could set to reasonably assure community

16   safety.  The Defendant has filed that letter from the doctor I

17   understand which states that in the doctor's opinion, there could

18   be conditions.

19         So if this Court is inclined to accept that the

20   presumption has rebutted -- has been rebutted, it's still the

21   Government's position that there are no conditions that can be

22   set to reasonably assure community safety.  And there are really

23   two big issues that the Government would ask the Court to

24   consider in that respect.

25         The first is that the level of danger to minors that is

1    involved in this case and being perpetrated by the Defendant in

2    the facts from the proffer, is too high to set conditions that

3    could reasonably assure community safety.

4           If we look at the Bail Reform Act, the first factor

5    that the statute directs us to consider is the nature and

6    circumstances of the offense charged, including if the offense

7    involves a minor victim.  We have two minor victims in this case.

8    And the nature and circumstances of this case, including the host

9    of charges that I described to the Court earlier, are very

10   severe.

11          We also look to weight of the evidence, which under

12   (g)(2) of 3142 is also a factor to consider and the Government

13   contends that it is strong in this case.  We have a plethora of

14   messages.  We have records of money being transferred and other

15   data that corroborate the story that has been told in this case.

16          And finally, under 3142(g)(4), we look to the nature

17   and seriousness of the danger to any person or the community that

18   would be posed by the Defendant's release.  The proffer that is

19   before the Court, specifically the messages, show her disregard

20   for the safety of children.

21          We have a situation here that is not a case of somebody

22   who's passively sitting at home reviewing child sex assault

23   material on their computer.  This Defendant is a hands-on

24   offender.  It may not have been her hands that were placed on

25   children.  But she directed, she caused, and she facilitated

1    sexual contact between these minors.

2          And we can see from the messages that were part of the

3    proffer that these children are stating and expressing fear and

4    discomfort.  CV1 is telling her, I'm scared.  What if she gets

5    uncomfortable?  Talking about the girl.  The Defendant doesn't

6    care.  She says, she'll tell you.

7          And then later when she tries to confirm with him

8    whether they had sex, she asked if his penis went inside her and

9    he said maybe.  And again, this is a minor child.  He says we

10   didn't know how to do it.  And the Defendant says, LOL, you'll

11   figure it out and tells him to try again.

12          That is someone who is not at all concerned with the

13   safety of these children, and in fact, has been directly a part

14   of the sexual manipulation and the exploitation of the two child

15   victims in this case.  And has admitted to sending text messages

16   that pertained to her talking to CV2 about sending photos of her

17   breasts.  So that's the first area that I'd ask the Court to

18   consider.

19          The second issue that I would ask the Court to consider

20   is the pattern of deceptive behavior that we see from the

21   Defendant throughout the facts and circumstances of this case.

22   From impersonating another parent to giving a minor child secret

23   electronic devices and telling him that he can't tell his family

24   about them.  And she was saved in the phone as mom.  And then

25   once that phone was taken up by federal authorities, we have her

1  husband trying to get it back.

2          And then of greatest concern to the Government, we see

3  her attempt to coach victims in this case, because what did the

4  Defendant do once she realized that she was likely under

5  investigation?  She got on TikTok, and she contacted CV1, and

6  talked to him about his story in an effort to try to get him to

7  change it.

8          And we see again, that even as recently as when she's

9  been in custody, she's still fixated on what CV2 is going to say,

10  when it pertains to her case.  She is focused on what these kids

11  are going to say at her trial.  If she's released on conditions,

12  she is going to continue to try to meddle in this case.  She is

13  going to seek out contact with the minor victims.

14          She is going to try to influence their testimony, just

15  as she did whenever she found out she was under investigation.

16  And she contacted CV1 in TikTok messages, and then shortly after

17  that, told CV2 to go on and delete the TikTok messages from her

18  on CV1's iPad.  And then again, trying to record CV1, trying to

19  get him to say that he had never been in her car when later she

20  admitted to the authorities that he'd been coming to her house.

21          So she can tell the doctor who spoke with her whatever

22  she wants.  Of course, she can tell the doctor that she's going

23  to follow conditions of the Court.  I presume that the doctor

24  didn't have access to all of the evidence that the Court is

25  hearing now.  But the Defendant can say one thing.

1          I think it's more important to look at the pattern of

2   behavior that she has exhibited.  And it's two big issues when we

3   look at that pattern.  It's a pattern of danger, of sexual

4   exploitation and manipulation.  And it's a pattern of deception,

5   that raises many questions about whether this Court can set any

6   conditions that can reasonably assure the safety of the community

7   and particularly prevent the further traumatization of the

8   victims in this case.

9          I submit that the Defendant is going to continue to try

10  to meddle with their stories and influence the outcome of this

11  case.  So for all those reasons, I would ask this Court to accept

12  the recommendation of the Pretrial Services Office and keep the

13  Defendant detained pending her trial.

14          THE COURT:  Thank you.

15          Mr. Kimmelman?

16          MR. KIMMELMAN:  Thank you, Your Honor.

17          To begin with, Your Honor, of course, we do not admit

18  any of the accusations that the Government is making.  Ms.

19  Swarner has not been convicted of anything as she sits here

20  before you today.  Specifically, in regards to the issues that

21  the Government raised on their argument, "the level of danger to

22  minors."  Your Honor, the allegations in this case involve two

23  alleged victims.  That's it.  Two.  And all of the alleged

24  contacts were by phone.

25          You heard nothing, because there is nothing.  And the

1   Government conceded that there's nothing to suggest that Ms.

2   Swarner ever physically did anything to any of these alleged

3   victims.  And so when Dr. Thompson -- who by the way was -- did

4   have access to discovery in this case, discussing with her

5   possible terms and conditions, that was not to get her approval,

6   but to measure her ability to understand those conditions, and

7   the consequences of violating those conditions.  And that's

8   exactly what he did.

9           And in his professional opinion, and you have his CV,

10  and this is a psychologist who has a tremendous amount of

11  experience in these kinds of cases, saying that there are terms

12  and conditions that can be fashioned to protect the community and

13  specific individuals, CV1 and CV2, as the Government has

14  described them.

15          This was not a hands-on offense, despite the argument

16  to the contrary.  And it is telling that under the auspices of

17  CPS, which is in the process of litigation with Mr. and Ms.

18  Swarner to remove their children based on the allegations brought

19  forth by the Government, is allowing written communication

20  between Ms. Swarner and her daughter through CPS.

21          So when she writes a letter to them, those letters are

22  reviewed by someone to make sure that there's nothing

23  inappropriate, untoward, threatening, or otherwise improper.  And

24  so Ms. Swarner has already demonstrated her ability to comply

25  with any condition like that on her.

1          THE COURT:  Well, she's incarcerated, so -- and she's

2  -- her letters go to CPS first.  So I'm not really sure that

3  proves much other than she knows how to behave when somebody is

4  monitoring her communications.

5          MR. KIMMELMAN:  And I'm not talking about the jail

6  reviewing her --

7          THE COURT:  No, I know.

8          MR. KIMMELMAN:  -- correspondence.  It's CPS.  And so

9  if she were to be released on bond, her communications would

10  still have to be through CPS.  If she were to attempt to

11  communicate with her daughter or her children outside of CPS,

12  then she would risk losing her children forever.  Because then

13  CPS, which is already litigating to take her children away, would

14  have that to go to a judge and say you need to terminate her

15  parental rights immediately because look what she did.

16          And so not only does she have a federal judge, who is

17  supervising her through Pretrial Services, but CPS as well.  And

18  the children are in foster care right now.  And so it's not like

19  Ms. Swarner can send them any kind of secret messages because the

20  kids are under supervision by foster caregivers, as well as

21  through periodic meetings with CPS caseworkers who are involved

22  in the childrens' lives, their welfare and communication with

23  their parents.

24          The crux of this case is digital communication.

25  There's no question that just based on the Government's proffer

1  today, and it is clear from that proffer that not allowing Ms.

2  Swarner access to a cell phone, internet, other than for medical

3  treatment, which can be supervised, no social media or anything

4  like that, then the concern that the Government raises is more

5  than adequately addressed by just not having any access to any

6  sort of digital communications.  Which is one of the conditions

7  that Dr. Thompson is recommending as well.

8  The report of Dr. Thompson also talks about his

9  assessment based on his professional opinion about her committing

10 any new sexual offense charges, and he has laid out all of the

11 reasons why she is at low risk for, as he said, arrest on new

12 sexual offense charges.  Her age, her criminal history, which is

13 remote, and the statute in Washington, and I'm not able to get

14 the underlying documents, so we don't have those.  Animal

15 cruelty-bestiality.

16 Whatever that means, if it's a more inclusive statute,

17 or that's the specific statute or what, but regardless, that is

18 already over 20 years old.  The information in the Pretrial

19 Services Report is that it stems from an incident about some

20 young kids shooting animals with BB guns and there's nothing to

21 contradict that in the record.

22 The crux of the matter, I suppose, is really just as

23 the Government articulated, the danger to two alleged victims,

24 one of whom is Ms. Swarner's daughter.  And the question then for

25 the Court is can there be some conditions that you can fashion

that would reasonably protect against any such danger?  And I
would submit that there are.  I mean, if she cannot communicate
with them in any sort of digital fashion.

If she is at a halfway house in Del Rio, three hours
away, with no access to phone, internet, or other means of
contacting either of them, the only one that she can write to is
her daughter and those letters are reviewed by CPS, then I think
that that dangerousness is sufficiently ameliorated and is
protected by the conditions of the Court.

And so I think that number one, that we have rebutted
the presumption, and number two, that the Government has not
shown how Ms. Swarner will continue to pose any sort of danger if
she has absolutely no way of contacting CV1 and CV2.  It is only
through correspondence that is reviewed by a CPS officer who is
antagonistic to Ms. Swarner and is looking to take her kids away
from her.  And so we think that the Court can and should fashion
terms of release.  Thank you.

THE COURT:  Thank you.  You look like you were about to
say something?

MR. CALVE:  Your Honor, I have brief responses to a
couple of those points, if the Court would like to hear it.  But
if not --

THE COURT:  It's fine.  I'll allow you the reply.

MR. CALVE:  Thank you, Your Honor.  On the question of
taking away her ability to talk to these victims, I just want to

1   reiterate that after CV1's mother took away the secret phone that

2   Defendant had given him for their communications, she found him.

3   She got on TikTok and she still found a way to communicate with

4   him and to communicate about his future testimony with him.  And

5   then she told CV2, in an effort to, I would say cover her tracks,

6   to make sure that those messages were deleted.

7          So it's not a question of going through the proper

8   channels and communicating with the kids.  It's that she'll find

9   other ways to talk to the victims in this case, and specifically

10  to talk to them about the matters that had been investigated or

11  are being prosecuted.

12         I'd also emphasize that we're not just talking about

13  online digital communications.  This part of the proffer had to

14  do with how CV1 was coming to the Defendant's home.  She was

15  giving him rides.  And that's where all of this happened.  It's

16  in-person sexual contact at her residence that she facilitated.

17  It's not just a question of digital communications.  And that

18  would be the scope of my response, Your Honor.

19         THE COURT:  Okay.  Thank you.  All right.

20         Ms. Swarner, in this case, the issue that the lawyers

21  are discussing is an issue of dangerousness in the community.

22  Not really flight risk isn't really the issue here.  I have to

23  say that I had already written down before Mr. Calve just said

24  that, this is not a case about -- just about digital

25  communications.

1    This is a case about actual sexual conduct between

2    minor children being encouraged, maybe even more than encouraged,

3    actively facilitated by a trusted grown up in their life.  And

4    the crux of the case is not digital communication.  It's

5    according to the proffer, the intentional manipulation of

6    children to engage in sexual activity that's inappropriate for

7    their age and stage of development.

8    The level of dishonesty and deception that was

9    exhibited at multiple junctures is very, very concerning, and

10   does give me pause in how much weight to give to the

11   psychologist's report.

12   And especially since the psychologist's report, in my

13   opinion, was primarily more his conclusions on what conditions

14   would be appropriate, but was quite light on analysis of how he

15   reached those conclusions based on the record that we have before

16   us.

17   Given your prior criminal history, which does -- I

18   mean, it was a long time ago, but it does involve violent

19   behavior, the nature of the offense and the minors involved.  I

20   don't think the only question is whether there's danger to CV1

21   and CV2.  I mean, I just don't have confidence that the

22   propensity to engage in that type of behavior might not also

23   affect other children who you could come into contact with.

24   You're subject to a mandatory minimum here.  This is a

25   difficult case.  But I think the Government has met its burden,

1  and I'm ordering you detained, or remaining detained.

2          Thank you.  We are in recess.

3        (Proceedings adjourned at 3:44 p.m.)

4                ---oOo---

5

6             **C E R T I F I C A T E**

7      I, DIPTI PATEL, court-approved transcriber, certify that the

8  foregoing is a correct transcript from the official electronic

9  sound recording of the proceedings in the above-entitled matter.

10

11  *Dipti Patel*

12  _____

13  DIPTI PATEL, CET-997

14  LIBERTY TRANSCRIPTS          Date: December 19, 2022

15

16

17

18

19

20

21

22

23

24

25